TYLER SMITH, OSB No. 075287
Tyler Smith & Associates, P.C.
181 N. Grant St., Suite 212
Canby, OR 97013
Tel. No. 503-266-5590
Fax No. 503-212-6392
E-mail: Tyler@RuralBusinessAttorneys.com
Of Attorneys for Plaintiff Victorina Mata

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **VICTORINA MATA**, <br><br> Plaintiff, <br><br> v. <br><br> **OREGON HEALTH AUTHORITY**, an Agency of the state of Oregon, **OREGON DEPARTMENT OF HUMAN SERVICES**, An Agency of the state of Oregon, **CATHLEEN KAUFMANN, PATRICIA WENTZ, and BEVIN HANSELL**, <br><br> Defendants. | Case No. 6:13-cv-00485-TC <br><br> **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## INDEX

Page

**Index** ...................................................................................................... ii

**Index of Authorities** ...................................................................... iii

    Cases Cited ................................................................................. iii

    Rules Cited ................................................................................. iv

**Introduction** ........................................................................................1

**Facts** ....................................................................................................1

**Response Points and Authorities** ...............................................4

    **I.**    Defendants erroneously argue that actions that Defendants took prior to January 31, 2011 are irrelevant or somehow can't be considered as part of forming Plaintiff's claims. ...........................................................................4

        a.  Statute of Limitations ...................................................4

        b.  Tort Claim Notice ........................................................7

    **II.**   The after acquired evidence doctrine does not apply to this case, and even if it were to apply in this case it is not a theory which could provide summary judgment. ...............................................9

    **III.**  Defendants wrongly argue that Plaintiff is not protected by Oregon's whistleblowing protections against retaliatory termination. .................................13

        a.  Evidence shows that management and Defendants both knew about much if not all of Ms. Mata's whistleblowing activities. ...................................13

        b.  Defendants erroneously argue that Plaintiff does not qualify for whistleblower protection under Counts 1 and 2 of Plaintiff's First Claim for Relief. ...........18

            1.  Plaintiff's allegations show mismanagement, gross waste of funds, and abuse of authority which are each independently sufficient to afford her protections as a whistleblower under the relevant statutes. .....................18

            2.  Plaintiff is entitled to a jury trial under ORS 659A.885 thus Defendants' argument that no jury trial is available under one of the three counts in Plaintiff's First Claim for Relief is both moot and erroneous. ................24

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

c.   Plaintiff caused various complaints to be filed against the Defendants and others and is thus protected by ORS 659A.230. .......................................25

IV.   Plaintiff has presented genuine questions of material fact showing that Defendants unlawfully abridged her First Amendment freedom of speech. ..........................26

a.   Plaintiff's speech was a matter of public concern. ........................................27

b.   Plaintiff spoke in her private capacity. ........................................................32

c.   Plaintiff was subjected to adverse employment action because of her protected speech. ....................................................................................................33

d.   Defendants have not provided any relevant factual analysis showing that some state interest outweighed Plaintiff's First Amendment rights. .......................35

e.   Defendants' argument that Plaintiff would have been fired because of conduct Defendants later discovery is legally irrelevant. ............................................36

## INDEX OF AUTHORITIES

*Amtrak v. Morgan*, 536 U.S. 101 (2002) ........................................................................5

*Barns v. City of Eugene*, 183 Or. App. 471 (2002) ........................................................7

*Benson v. State*, 196 Or. App. 211 (2004) .....................................................................8

*Clark v. Musick*, 623 F.2d 89 (9th Cir. 1980) ..............................................................5

*Connick v. Myers*, 461 U.S. 138 (1983) ..............................................................27, 29

*Davis v. Bostick*, 282 Or. 667 (1978) ...........................................................................5

*Dowers Farms, Inc. v. Lake Cnty*, 288 Or. 669 (1980)...................................................7

*Eng v. Cooley*, 552 F.3d 1062 (9th Cir. 2009) ........................................................26, 37

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) .............................................................10, 27

*Gaston v. Parsons*, 318 Or. 247 (1994) .......................................................................8

*Herbert v. Altimeter, Inc.,* 230 Or. App. 715 (2009) ...................................................19

*Holdner v. Columbia Cnty*, 51 Or. App. 605 (1981) .....................................................8

*Huber v. Or. Dep't of Educ.*, 235 Or. App. 230 (2010) .........................................19, 25

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

*Hunt v. City of Portland*, 2011 U.S. Dist. LEXIS 64068 (D. Or. June 16, 2011) .................25

*Johnson v. Multnomah Cnty*, 48 F.3d 420 (9th Cir. 1995) .................................27, 29, 30, 32

*Knickerbocker v. City of Stockton*, 81 F.3d 907 (9th Cir. 1996) ..............................37

*Lake Oswego v. Mylander*, 84 Or. App. 15 (1987) .................................................11

*Love v. Polk Cnty Fire Dist.*, 209 Or. App. 474 (2006) .........................................10

*Mantia v. Hanson*, 190 Or. App. 36 (2003) ...........................................................25

*McKennon v. Nashville Banner Publ. Co.*, 513 U.S. 352 (1995) .........................9, 10

*McKinley v. Eloy*, 705 F.2d 1110 (9th Cir. 2006) ....................................................27

*Miller v. Fairchild Indus., Inc.*, 885 F.2d 498 (9th Cir. 1989) .................................24

*Mt. Healthy City Sch. Dist. Bd. Of Educ. v. Doyle*, 429 U.S. 274 (1977) .................37

*O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756 (9th Cir. 1996) ..............9

*Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968) .....................................................26

*Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755 (9th Cir. 2006) ..........................29

*Robinson v. Shipley*, 64 Or. App. 794 (1983) ..........................................................7

*Robinson v. York*, 566 F.3d 817 (9th Cir. 2009) ....................................................27

*Sanders v. City of Newport*, 657 F.3d 772 (9th Cir. 2011) .....................................24

*Sanok v. Grimes*, 306 Or. 259 (1988) .....................................................................8

*Stephens v. Bohlman*, 314 Or. 344 (1992) ..............................................................7

*State v. Knobel*, 97 Or. App. 559 (1989) ...............................................................12

*State v. Lissy*, 304 Or. 455 (1987) .........................................................................12

*Ulrich v. City & Cnty of S.F.*, 308 F.3d 968 (9th Cir. 2002) ...................................27

*U.S. Nat'l Bank v. Davies*, 274 Or. 663 (1976) ......................................................5

*Webb v. Highway Div. of Or State Dep't of Transp.*, 293 Or. 645 (1982) ...............7

**RULES CITED**

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

United States Code

29 USC § 621 ...........................................................................................................9

29 USC § 626 ...........................................................................................................9

42 USC § 1983 .........................................................................................................6

Federal Rules of Civil Procedure

FRCP 56 ..................................................................................................................26

Oregon Revised Statutes

ORS 12.010 ...............................................................................................................5

ORS 12.080 ...............................................................................................................5

ORS 25.337 .............................................................................................................24

ORS 30.275 ...............................................................................................................7

ORS 165.540 ......................................................................................................11, 12

ORS 659A.199 ............................................................................................... 6, 18, 24

ORS 659A.200 .........................................................................................................19

ORS 659A.203 ............................................................................................... 6, 18, 24

ORS 659A.230 ..............................................................................................6, 24, 24, 26

ORS 659A.885 .........................................................................................................24

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT**

## INTRODUCTION

Defendants Motion for Summary Judgment must be denied because there are disputed facts with respect to all three of the Counts constituting Plaintiffs First Claim for Relief and with Plaintiffs Second Claim for relief. The record, either on its own, or when viewed in a light most favorable to Plaintiff Mata demonstrates that there are disputes of material fact whereby Defendants are not entitled to judgment as a matter of law.

Defendants present a false narrative of a squeaky clean, smoothly operating government agency, and attempts to color Ms. Mata's complaints as trivial, unreasonable or unfounded. Defendants' "Introduction" recites a "story" that simply does not connect with the facts. Defendants characterize complaints dealing with multiple millions of dollars, fraud, embezzlement, no-bid contracting, payments for services not rendered, and defrauding the federal government as "minor issues". Defendants describe Defendants' willingness to silence and intimidate multiple employees that had the same view as Plaintiff, some who quit and some who were fired, as mere "interpersonal relations". Defendants flat out lie that "not one manager at OHA had any idea that plaintiff had made her reports". Defendants further concoct a story that no-one else agreed with or would believe Ms. Mata, when in fact many co-employees agreed with her, the Secretary of State audit did find multiple instances of wrongdoing amounting to around $4.5 million, and the investigative journalists and media started investigating issues which are still being uncovered and making headlines as late as October 2014 with another no-bid contract approved by Defendant Kaufmann. The facts do not support Defendants' narrative and when the facts and allegations are reviewed objectively outside the myopic lens of Defendants false narrative a different picture emerges.

## FACTS

Victorina Mata was hired in the position of a Public Affairs Specialist on August 9, 2009. Her role at that time consisted of multiple duties. In addition to marketing functions which Defendants admit, Ms. Mata was involved in all of the communications functions of the agency,

1   **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

drafting mailings, preparing printed materials for outreach workers, updating the website, assisting with press releases, developing talking points for agency heads, working on media events with the governor's office, attending Healthy Kids advisory committee meetings, attending Healthy Kids steering committee meetings, attending staff meetings, and attending morning huddles. *See* Decl. of Tyler Smith Ex. 4, ("Mata Dep." hereafter) 47:20-52:2. Ms. Mata's role also included being a co-lead for the Transition communication, and communications lead for the brand identity for the new Oregon Health Authority, and ensuring timely, accurate, balance and fair handling of news issues and many other task as outlined in her job description. Mata Dep., pp. 29-34, Ex. 108. By around November of 2009 Ms. Mata started to question the number of children without insurance that was being used by the agency in public and media materials and being reported to the federal government. Mata Dep. 48:13-20. Shortly after Ms. Mata questioned the accuracy of those numbers she her management no longer involved her in the press releases. *Id*. Ms. Mata progressively had all of those duties stripped from her through 2010 until early 2012 when she was terminated. Mata Dep. 49:1-52:12; 58:19-59:13. By early 2012 Ms. Mata was doing little more than data entry. Mata Dep. 99:14-16. Ms. Mata was left with a sliver of the roles she was hired to perform as shown by her job description. Mata Dep. pp. 29-34, Ex. 108. Each of the duties she was stripped of either related to her ability to hear and obtain information about the enrollment numbers, federal grant funding, federal bonuses, or her ability to relay her information and ask questions of other team members. Ms. Mata started discussing with other employees that what she uncovered was the close relationship between the inflated numbers, excess funds coming in over budget and special pet projects and grants to friendly organizations. Mata Dep. p. 42, Ex. 125. One of the other employees who questioned the accuracy and legality of using those numbers ended up quitting over the practice after she confronted Ms. Kaufman about it. Decl. of Tyler Smith, Ex. 9 ("Hanks Dep.") 37:23-25. Charles Gallia, the employee who had been part of the group developing those numbers for many years also expressed concerns and agreed with Ms. Mata and Ms. Hanks and he was also

2    **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

told to leave the issue alone.  Decl. of Tyler Smith, Ex. 10 ("Gallia Dep.) 21-23.  Shortly after

than time Ms. Mata had her office location physically moved away from Mr. Gallia and

extremely near Ms. Wentz to a location where Ms. Wentz could view Ms. Mata's computer

screen.  Mata Dep. 75:8-10.  Ms.  Mata was told that she was being transferred to be closer to her

peers so she could "learn the agency way" and that the customer, Defendant Kaufman, was

always right.  Mata Dep. 75:5-10; Decl. of Victorina Mata ¶ 10.  Ms. Mata however did not quit,

transfer or shut up.  Instead, Ms. Mata continued to investigate the use of inaccurate numbers and

other matters all the way through her employment there into 2012, repeatedly questioning and

disclosing to people and agencies her concerns about the enrollment numbers, uninsured

numbers and use of the funds in various ways.  She discussed them with her managers.  Mata

Dep. 130:1-131:25; Mata Dep. pp. 35, Ex 114.  She reported it to other state agencies.  Mata

Dep. 214:1-10. She escalated her concerns to the Secretary of State. Mata Dep. 213:4-17   She

sought assistance from legislators. Decl. of Victorina Mata ¶ 20.  She reported the problems to

the Department of Justice Medicaid Fraud unit.  Mata Dep. 207:12-15.  Ms. Mata continued so

witness her responsibilities shrink and be excluded from meetings and have her presentation

duties taken away.  Mata Dep. 58:17-59:13.  Conversations and meetings were literally shut

down forcefully by her management when they started talking about things they did not want

Ms. Mata to hear.  Aff. of Amber Marcus ("Marcus Aff.") ¶ 6.  Defendant Hansel even told

another employee to stop notifying or inviting Ms. Mata to meetings.  Marcus Aff. ¶¶5-7.  By

that time, the number of issues she had blown the whistle on was growing quite large.

Defendants suspected, knew about, and even discussed the fact that Ms. Mata had been

reporting and disclosing many of these concerns as time went by.  Ms. Wentz told her to stop

investigating the accuracy of the numbers.  Mata Dep. 65:1-24.  Ms. Mata continued to

investigate or disclose information on double payments for services; prepayments for services;

and excess or unwarranted grants being given to organizations like the Urban League and other

application assister entities.  Decl. of Victorina Mata ¶ 32.  Ms. Kaufmann at one point even

3    **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT**

asked Plaintiff to enter into a no-bid contract in violation of state rules.  Decl. of Victorina Mata
¶ 19.  Directly contrary to Defendants' narrative, Defendants' managers knew about the
whistleblowing in 2010 because Ms. Mata had brought it up to them first.  Mata Dep. pp.36, Ex.
118; Decl. of Victorina Mata ¶ 33.  Defendants specifically discussed amongst themselves
whether Ms. Mata was the source of the information that triggered the Secretary of State audit
which resulted in approximately 4.5 million dollars being discovered as being unwarranted.
Decl. of Tyler Smith, Ex. 6 ("Wentz Dep.") 169:1-21.  The Secretary of State did conduct its
audit and issued a report outlining the errors that had violated the law and agency rules and
policies.  Mata Dep. pp. 50-60, Ex. 129.   During this time the media and press continued to
hound the agency, making multiple public records requests and writing more than a dozen stories
on the various scandals on the lack of accountability, overpayments, audit results and even
eventually the no-bid contracting and more. Decl. of Victorina Mata ¶¶ 30-33, 36, 38.  Ms. Mata
also disclosed to the press that the agency had been wrongfully withholding information from
public records requests and attempted to help the media uncover the facts.  Mata Dep. 69:8-11.
Soon after that, another one of the Defendants instructed staff to cease taking meeting notes so
there would be no records the public could obtain.  *Id*.  Inside the agency they knew about these
developing news stories in the media and frequently went into crisis mode to try to spin the story
to save the agency and program's image.  Mata Dep. pp 66-67, Ex. 134.  Eventually, by February
of 2012 Ms. Mata filed a BOLI complaint alleging many of the same ongoing retaliatory actions
alleged in this lawsuit.  Defendants had even sent around an open request soliciting complaints
about Ms. Mata.  Decl. of Victorina Mata ¶ 26.  Less than two months later she was terminated.
There was zero effort by anyone of her supervisors to help her transition or change to a different
division.  Decl. of Victorina Mata ¶ 43.  This was a violation of what was known as the agency
"core values".  Ms. Mata was also targeted because she was no union represented.  Decl. of Tyler
Smith, Exhibit 1 ¶ 15-20.  In direct contradiction with the pre-text story asserted by Defendants,
in another case the State of Oregon admitted there were other options, Ms. Mata's termination

4    **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT**

was not dictated by the legislature and there were optional discretionary decisions made by Defendants on whether to cut and who to cut.  Smith Dec. Exhibit 1, ¶¶ 15-20.  Ms. Mata was even told a different story when she was terminated.  Decl. of Victorina Mata ¶ 45. When viewed in a light most favorable to Plaintiff, Defendants' story is a fabricated pre-text.  When viewed most favorable to Defendants it is still inconsistent.

## RESPONSE POINTS AND AUTHORITIES

I.    **Defendants erroneously argue that actions that Defendants took prior to January 31, 2011 are irrelevant or somehow can't be considered as part of forming Plaintiff's claims.**

    a.  Statute of Limitations.

    Defendants allege that no actions prior to two years before plaintiff filed this lawsuit is "relevant" or "may form the basis of plaintiff's claim."  Defendant is incorrect in asserting that no prior conduct is "relevant" or may be part of the "claim" if it took place prior to the limitations period.

    First, the admission of relevant evidence is never barred by a statute of limitations.  The Supreme Court considered that argument exactly and held that: "the statute [of limitations] [does not] bar an employee from using the prior acts as background evidence in support of a timely claim."  *Amtrak v. Morgan*, 536 U.S. 101, 113 (2002).  Thus, evidence, and actions taking place prior to January of 2011 can both be admitted as evidence and used to support plaintiff's claims.

    Second, actions or events which took place outside of the statute of limitations period are not even barred from being their own claim unless they are discrete recoverable claims which can or do independently form their own cause of action.  For instance both the discovery rule and continuing tort theories don't always start the running of the statute of limitations on the day of the event. A claim is within the statute of limitation even if the first action occurred beyond the statute of limitation if the harm complained of "reach[es] the level of actionability" only at the end of a series of events.  *Davis v. Bostick*, 282 Or. 667, 672 (1978).  In this case Plaintiff has alleged

5    **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

an ongoing pattern retaliatory actions, discipline that ultimately culminated in a carefully planned termination after Plaintiff filed a BOLI claim.    "[A]t the heart of the continuing tort idea is the concept that recovery is for the cumulative effect of wrongful behavior, not for discrete elements of that conduct." *Id.* at 671–672. Oregon Courts use this principle in the interpretation of ORS 12.010 and 12.080, which are the applicable state law statutes for §1983 claims in Oregon: "… [a cause of action] consists of every fact which it would be necessary for the plaintiff to prove, if traversed, in order to support his right to judgment." *U.S. Nat'l Bank v. Davies*, 274 Or. 663 (1976), see also *Clark v. Musick*, 623 F.2d 89 (9th Cir. 1980) (holding ORS 12.080 as applicable statute for §1983 claims.)

In Morgan, the Supreme Court applied a similar analysis for the statutory scheme available under Title VII, and held that "discrete discriminatory acts are not actionable if time barred." *Amtrak v. Morgan*, 536 U.S. 101, 113 (2002). However, the Court also held that other cumulative claims, such as a hostile work environment, would support the application of the continuing violation doctrine because such a claim "is composed of a series of separate acts that collectively constitute one unlawful employment practice." *Id*. at 117. Under no theory, argument, or set of facts could the retaliatory termination claim or even most of the retaliatory discipline type actions Defendants took have been prior to two years before the filing of this suit, thus Defendants' argument is wrong but also largely moot. Defendant would have to allege and prove that something prior to two years before filing of this suit, was independently actionable and complete at that time. They have not even attempted to do so.

In this case, Plaintiff's first claim for relief Count 1, is brought under ORS 659A.199 for unlawful employment practices of wrongful discharge, discrimination, and retaliation. Count 2 is brought under ORS 659A.203 retaliation and wrongful employment practices for whistleblowing. The third count is brought under ORS 659A.230 for discrimination and retaliation for reporting to, complaining to, and cooperating with investigations against Defendants and their agency. Thus the court must consider any facts or events that took place prior to the limitation date that support

or otherwise add evidentiary weight to plaintiff's claims under ORS 659A.199, 659A.203, or 659A.230. The Second Claim for Relief is the 42 U.S.C. § 1983 claim.  Such evidence would only be time barred if the particular event in question was being presented independently and as its own separate claim or cause of action.  For instance in Plaintiff's First Amended Complaint there are more than twenty-two listed events that took place during the relevant period of time which at trial will each and all go to prove the progressive pattern of discipline and retribution against Plaintiff for her whistleblowing and demanding that Defendants follow the law and state rules. Such events are not barred as evidence of the undisputedly timely filed claims.

Defendants' characterization of any facts prior to January 31, 2011 as inherently barred by the statute of limitations, or not relevant when and if they are probative etc., is a misstatement of the law.  Further, when the facts are viewed in a light most favorable to Plaintiff, Defendants' motion must fail.  Plaintiffs did not attempt to break each fact or every single event into twenty plus separate discrete causes of action.  Defendant has proffered no facts or argument that any of the acts complained of by Plaintiff rise to a sufficient level to create their own discrete claims.

### b. Tort Claim Notice

Defendants argue that conduct or events 180-days prior to the delivery of Plaintiff's Tort Claim Notice under ORS 30.275 on February 9, 2012, should not be applicable, relevant, or discussed in this case.  Defendants are again incorrect.  First, it must be pointed out that the rules of law derived from the cases cited in this section of Defendants' brief do not relate to the facts of this case.  Defendants' string cite cases for the general proposition requiring a tort claim notice in general and the relating sufficiency of a tort claims notice.  Defs.' Mot. For Summ. J. p. 17 (Citing *Robinson v. Shipley*, 64 Or. App. 794 (1983) (explaining that a general request for documents did not constitute a tort claim notice)).  The facts from that case and the rule of law derived from that case is easily distinguished. There is no factual contention in this case that no tort claim notice was

7    **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

filed. In fact, Defendants admit the tort claim notice was filed. Decl. of Abrams. Ex. H.

Substantial compliance with the tort claim notice statute is sufficient to give notice to the state.

*Webb v. Highway Div. of Or. State Dep't of Transp.*, 293 Or. 645, 651 (1982).

Oregon courts have long held that both the discovery rule and the continuing violation

doctrine apply to the notice period and limitations period under the OTCA. *Stephens v. Bohlman*,

314 Or. App. 344, 352 (1992) (notice period); *Dowers Farms, Inc. v. Lake Cnty*, 288 Or. 669, 681

(1980) (limitations period); *Barns v. City of Eugene*, 183 Or. App. 471, 475 (2002) (continuing

violation doctrine.) In the present case, the facts support that there was a continuing pattern and

practice of Defendants silencing and excluding Ms. Mata from meetings, roles, communications,

and interaction relating to the topics and government program which she had complained about

and blew the whistle on. See Sections II and III below. Those are the continuing tortious actions

which formed the basis for the lawsuit, and specifically there are uncontested facts showing that

some of the most egregious acts did not even take place until 2011 and 2012. A few brief examples

include uncontested facts such as Defendants' admission that Ms. Mata was selected for

termination in April of 2012. Defs' Answer to Plaintiff's Sec. Amend. Compl. p. 5. Defendants

admit that Plaintiff met with a DOJ investigator in October of 2011. Defs' Mot. Summ. J. p.8.

State workers explain and testify that Ms. Mata was excluded from meetings and duties during this

time all the way through her remaining employment. Marcus Aff. ¶¶ 5-7. These facts demonstrate

that when the evidence is viewed by a reasonable person, or in a light most favorable to Plaintiff,

most, if not all of the discriminatory and retaliatory actions constituting the wrongful employment

practices were not complete or even finished prior to either 180 days or two years periods.

Further, no tort claim notice is even required for a civil rights claim. *Sanok v. Grimes*, 306 Or.

259, 262 (1988).

8    **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Even if there weren't a continuing tort, the 180-day period begins to run when the person knows, or reasonably should know, facts that would make an objectively reasonable person aware of a "substantial possibility" that all of the following elements are present: an injury occurred, the injury harmed the person's protected interests, and the defendant is the responsible party. *Gaston v. Parsons*, 318 Or. 247 (1994); *see also Benson v. State of Oregon*, 196 Or. App. 211(2004) (what a person reasonably should know is question of fact). With a continuing tort,

> [N]otice of claim filed any time during the continuance of the conduct or within 180 days after its conclusion is necessarily timely. Because there is no *single* accident or occurrence giving rise to the claim, the 180-day period for presenting the notice cannot be measured from the claimant's first observation of the tort and its results. Similarly, in cases of continuing torts, a notice like the one involved, which states that the injury or loss occurred "from time to time," is sufficient to apprise the public body of the time of the loss or injury. *Holdner v. Columbia Cnty*, 51 Or. App. 605, 613 (1981).

In this case, defendants' unlawful conduct continued, and parts of it hadn't even happened until well after 180 days before plaintiff filed her required notice. Ms. Mata could not be charged with notice of events that constitute her retaliatory discharge before she was even discharged. Defendants' assertions that anything prior to 180 days prior to Plaintiff's Notice of Claim is irrelevant or somehow time barred is incorrect.

## II.    The after acquired evidence doctrine does not apply to this case, and even if it were to apply in this case it is not a theory which could provide summary judgment.

Defendants attempt to argue that the doctrine of after acquired evidence should somehow bar recovery on Plaintiff's retaliation claims and entitle them to summary judgment. While that doctrine has been applied in certain ADEA, (29 U.S.C. § 621) for age discrimination, and Title VII claims, Defendants' argument is a gross misstatement of that doctrine and does not apply to this case.

First, the U.S. Supreme Court has stated that "if an employer discharges an employee for a discriminatory reason, later discovered evidence that the employee could have been discharged for a legitimate reason does not immunize the employer from liability." *O'Day v. McDonnell*

9    **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

*Douglas Helicopter Co.*, 79 F.3d 756, 761 (1996) (citing *McKennon v. Nashville Banner Publ. Co.*, 513 U.S. 352, 358 (1995)).  Thus, Defendants' use of this doctrine at this stage of a summary judgment proceeding is premature at best.  The Ninth Circuit has explained that, "the only issue raised by the employer's after-acquired evidence is what the employee's remedy will be".  *O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 761 (1996) (citing *McKennon*, 115 S. Ct. at 883-84).   The courts in those cases go on to explain the applicable statues in ADEA and Title VII claims and point out that after acquired evidence can sometimes be appropriate bar to parts of the remedy in those type of cases where the remedies are specified by statutes as back-pay or reinstatement, or other where equitable remedies are presented.

> "When confronted with a violation of the ADEA, a district court is authorized to afford relief by means of reinstatement, back pay,  injunctive relief, declaratory judgment, and attorney's fees.  In the case of a willful violation of the Act, the ADEA authorizes an award of liquidated damages equal to the back pay award. 29 U.S.C. § 626(b). The Act also gives federal courts the discretion to "grant such legal or equitable relief as may be appropriate to effectuate the purposes of [the Act]."

> *McKennon v. Nashville Banner Publ. Co.*, 513 U.S. 352, 357-358 (1995) (citations

omitted).  The court then explained:

> We have  rejected the unclean hands defense "where a private suit serves important public purposes." That does not mean, however, the employee's own misconduct is irrelevant to all the remedies otherwise available under the [ADEA] statute. The statute controlling this case provides that "the court shall have jurisdiction to grant such legal or equitable relief as may be appropriate to effectuate the purposes of this chapter, including without limitation judgments compelling employment, reinstatement or promotion, or enforcing the liability for [amounts owing to a person as a result of a violation of this chapter]."

> *McKennon v. Nashville Banner Publ. Co.*, 513 U.S. 352, 360-361 (1995) (citations omitted).

Thus, the "unclean hands" or after acquired evidence defense is not a bar to this suit, and is also not even a complete bar to recovery IF it was ultimately proven true.  For this reason, summary judgment on this ground must be denied.

10  **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Second, it is obvious that this case is not an ADEA or a Title VII case. Plaintiff is not seeking reinstatement, nor are the statutes cited for ADEA or Title VII claims at issue here. Instead this case is a whistleblower and retaliatory discrimination case. That aspect significantly distinguishes this case from the cases where the doctrine was applied because, as discussed in *McKennen supra*, the doctrine does not apply to bar a suit when the suit serves important public purposes. There are multiple important public purposes served from whistleblowing statutes. See *Love v. Polk Cnty Fire Dist.*, 209 Or. App. 474, 496 (2006); *Garcetti v. Ceballos*, 547 U.S. 410, 425, (2006) (Exposing governmental inefficiency and misconduct is a matter of considerable significance). Defendants' argument that the federal court's interpretations of Title VII can be used to interpret parts of Chapter 659A is misguided here because this case is neither an age nor sex discrimination claim. The very fact that it is a whistleblowing and retaliation case distinguishes this case from the others. It is unconscionable for the state of Oregon to argue that a state employee who is a whistleblower can't bring a whistleblower claim because the subject matter they disclosed, or attempted to disclose, was deemed confidential. Defendants' argument which can be accurately re-phrased as "we would have fired you anyway if we knew you were trying to blow the whistle" would eviscerate the entire important public purpose of whistleblowing protections in the first place, and it is unconscionable for Defendants to suggest that.

Last, Defendants' attempt to characterize Plaintiff's discussion with the media as some kind of illegal act separate and independent act from her whistleblowing is absurd and contradicts the law and the facts. Among the various wrongdoings by Defendants which Ms. Mata had been disclosing to the media was the fact that Defendants had been intentionally hiding information that would be responsive to public records requests made by Mr. Budnick. Mata

11   **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Dep. p. 69:8-11.  Another was that Defendants would instruct people on that call to not take

notes so that there would be no evidence which the media could obtain.  *Id.*

Even if the addition of the media to the phone call had taken place, Oregon law only

requires consent from one participant to a telecommunication to be legal, while the other part of

the statute requires that in order for a recording to be legal all participants in a conversation must

be informed that it is being recorded. *Lake Oswego v. Mylander*, 84 Or. App. 15, 18 (1987).

Thus, ORS 165.540(1)(c) requires an attempt to record the conversation.  There is no evidence,

no allegation, and zero facts or hint of evidence that there was any attempt to record.  Ms. Mata

and Mr. Budnick never discussed him recording the call.  Decl. of Victorina Mata ¶ 38.  She

never offered to record the call, and she never told him to record the call.  Decl. of Victorina

Mata ¶ 38.  The facts demonstrate that the line was offered to help Mr. Budnick get the

information he had been seeking through public records requests.  Mata Dep. 346:12-14.  The

meeting was a public meeting about how public dollars where being spent and the media had a

right to know.  Mata Dep. 346:1-2.  In *State v. Knobel*, 97 Or. App. 559, 562-56 (1989) the

Oregon Court of Appeals explained:

> A reading of the entire statute and its legislative history reveals that its primary purpose is
> the prohibition of various forms of electronic surveillance. Consistent with that purpose,
> we read ORS 165.540(1)(c) to prohibit only the use of a device, contrivance, machine or
> apparatus to intercept a conversation in any form. Because, by  transcribing or taking
> notes of a conversation a person does not actually "intercept" the conversation by means
> of the device, contrivance, machine or apparatus, but rather first hears it by means of his
> auditory senses, transcription or note taking is not prohibited. Only when the device,
> contrivance, machine or apparatus itself intercepts the conversation does ORS
> 165.540(1)(c) apply.
>
> *State v. Knobel*, 97 Or. App. 559, 562-56 (1989) (citations omitted).

Thus, Defendants theory is wrong both on the facts and on the law.  Ms. Mata's invitation to Mr.

Budnick would not even have been a violation of the law if he had recorded it.  Ms. Mata was a

12  **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT**

participant, and obviously she would have been consenting.  The legislative history supports the

conclusion that ORS 165.540(1)(a) was intended to allow anyone, including a police officer, to

tape record a telephone conversation, if one party to the telephone conversation consents.  *State*

*v. Lissy*, 304 Or. 455, 463 (1987).

Further, Defendant is simply wrong on the facts, Ms. Mata was inviting Mr. Budnick to

listen in on a phone call where she was a participant.  Mr. Budnick replied within one hour

indicating he declined.  Mata Dep. p. 68, Ex. 137.  Both individuals talked shortly after the email

exchange and it was clear that Mr. Budnick would not call in at all.  *Id*. at 345:18-20.  The

alleged action that hypothetically might have been, never even took place.  Defendants' parade

of horribles such as disclosure of addresses or phone numbers of health care patients in the

Healthy Kids program is immaterial and speculation at best.  It is an obviously contrived fact,

dressed up like a violation of the law that Defendants are attempting to use as an escape.  A

person cannot "would have been fired" for something that never occurred. This is an obvious

pretext.  Ms. Kaufmann's declaration as to this issue is clearly contrived and cannot survive

summary judgment in viewing all evidence in a light most favorable to Plaintiff.  She says, "Ms.

Mata would have been, as I understand it, assisting in a violation of Oregon law."  Decl. of Cathy

Kaufmann ¶ 3.  As noted above, Defendants' counsel has the law wrong on his analysis of the

eavesdropping law, and he apparently advised her wrongly in preparing her declaration on this

specific issue as Ms. Kaufmann goes on to essentially admit that she would have terminated Ms.

Mata for whistleblowing even though Ms. Kaufmann herself would have been violating the law

to do so.   Ms. Kaufmann admits that she would have retaliated against Ms. Mata for alerting the

media to Ms. Kaufmann's wrongdoing. Decl. of Cathy Kaufman ¶ 4.  Her testimony shows that

Ms. Mata violating Ms. Kaufmann's orders and directives to essentially shut up or be fired was

sufficient that Ms. Mata "would not have been employed."  Decl. of Cathy Kaufmann ¶ 4. This evidence when viewed in a light most favorable to Ms. Mata could be enough itself to survive summary judgment.  This is exactly what retaliatory termination cases are about: disclosing something the boss does not want their boss, the public, or the government, to find out about and being terminated for it.  Ms. Mata has more than sufficiently provided evidence to show that a reasonable jury could find that the termination of Ms. Mata was retaliatory and that the disciplinary acts were retaliatory.  The record is full of evidence that Ms. Mata was retaliated against repeatedly having her job duties taken away, ultimately leading to her termination.  The full analysis and citations to the whistleblowing activities are included below in response to Defendants' argument III and are incorporated herein.

**III.   Defendants wrongly argue that Plaintiff is not protected by Oregon's whistleblowing protections against retaliatory termination.**

   **a.   Evidence shows that management and Defendants both knew about much if not all of Ms. Mata's whistleblowing activities.**

Defendants' factual contention that no one took any actions based upon the whistleblowing and that "no manager at DHS or OHA knew she purportedly 'blew the whistle'" is not a supportable position upon a basic review of the evidence in this case.  Defendant's theory on the facts and misstatements of the evidence are so far from what the evidence does show that the proposition cannot withstand Defendants' burden of proving that viewing all evidence in a light most favorable to Plaintiff, that somehow Defendant would be entitled to judgment as a matter of law.

The record is bulging with examples of Ms. Mata engaging in the protected activity such as discussing the double payments directly with Ms. Kaufman (Decl. of Tyler Smith, Ex. 5 ("Kaufmann Dep.") 121:5-17; 126:3-9) and with Ms. Wentz (Mata Dep. p.38, Ex. 118);

14   **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

discussing the state paying for services it had not received with Ms. Kaufman and Ms. Mata

discussing with Ms. Wentz that she was being pressured to use the half-baked numbers

(Kaufmann Dep. 121:5-17; 126:3-9; Wentz Dep.,p.6); complaining and pointing out the unlawful

no-bid contracting by Ms. Kaufman and others at the top of the Agency with the media and other

agency departments (Decl. of Victorina Mata ¶ 19, 22; Mata Dep. 172-175); discussing and

alerting management to erroneous and overstated enrollment numbers with many people (Mata

Dep. 130-131; Mata Dep. p. 35); discussing these issues with other agency departments (Decl. of

Tyler Smith, Ex. 7 ("Evans Dep.") 14:1-15:25); talking about these issues in group public

meetings (Decl. of Victorina Mata ¶ 10); disclosing the wrongdoings to the Department of

Justice (Mata Dep. 207:12-15); disclosing and reporting the wrongdoings to the Secretary of

State officials (Mata Dep. 213:14-17; Wentz Dep. 169:10-19); discussing the information about

the wrongdoing with co-workers (Mata Dep. 214:8-13; Decl. of Tyler Smith, Ex. 8 ("Feeny

Dep.") 27-28); informing multiple members of the media about the wrongdoings (Mata Dep.

172-175); passing information to the secretary of state audits division and even meeting with

them to discuss the facts in detail (Mata Dep. 148:20-22); reporting the wrongdoing and

problems to legislators who directly forwarded the inquiries to Defendants (Mata Dep. 169:8-17;

Decl. of Victorina Mata ¶ 20); reporting the fraud to the federal government Medicaid fraud

division of the United States Department of Justice (Mata Dep. 182:14-19; 148 13-14) and more.

Contrary to Defendants' attempt to argue otherwise, Defendants' own e-mails and documentary

statements prove that they knew and even discussed Ms. Mata's activities.

On November 9, 2010, Ms. Mata sent an e-mail to Defendant Wentz explaining that, "I

looked at the 104,000 uninsured children numbers and I learned that the number is half-baked. I

do not believe it is a number to be transparent, defensible, or credible, and I am feeling pressured

15    **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT**

to use it." Mata Dep. 131:7-17.  Ms. Mata was told to stop questioning the accuracy of numbers

she was using to inform the media and public about the enrollment numbers of the program.

Mata Dep. 64:20-65:24.  Ms. Mata was told that she and everyone else questioning the accuracy

of the enrollment numbers was wrong and that she should not question Ms. Kaufmann.

Defendant Wentz admits that she specifically talked with Defendant Kaufman about the concerns

that had been raised by Ms. Mata.  Wentz Dep. 151:12-14.  It was made clear to Ms. Mata by

other employees that employees of the agency cannot question or challenge Ms. Kaufmann or

Ms. Wentz or they will be punished.  Decl. of Victorina Mata ¶ 13, 21; Feeny Dep. 22:10-13;

Hanks Dep. 49:9-20.  Ms. Mata was told by Cathy Kaufman to stop investigating the accuracy of

the numbers she was told to use for press briefings.  Mata Dep. 64:20-24.  One employee prior to

Ms. Mata's termination was forced to quit her position over this issue. Hanks Dep. 37:16-25.

Ms. Mata was told by Patty Wentz to not look into the accuracy of invoice payments and

irregular financials. Mata Dep. 65:1-24.  Cathy Kaufmann through Bevin Hansel instructed other

employees such as Amber Marcus to exclude Ms. Mata from meetings and other

communications so that Ms. Mata would no longer be able to ask questions or have access to that

information.  Aff. of Amber Marcus ¶ 5; Mata Dep. 67:15-21; Feeny Dep. 41:16-25, 42:1-16;

Decl. of Tyler Smith, Ex. 12 ("Acevedo Dep.") 20:18-21.  Ms. Mata was told by Cathy Kaufman

to stop talking with Dr. Gallia about the accuracy of the numbers.  Mata Dep. 75:1-3.  Ms. Mata

was told by Ms. Wentz that when working for the government the "client is always right" just

like if you are working for Nordstrom, and Cathy Kaufmann was the client.  Mata Dep. 75:5-10;

Decl. of Victorina Mata ¶13.  After Ms. Mata had started raising her concerns, Ms. Mata was

specifically told by Ms. Wentz that she was being moved to learn 'the agency way' from her

agency peers.  Mata Dep. 75:8-10.  Ms. Mata was physically moved away from Dr. Gallia and

16   **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT**

ultimately put in a cubical about 10 feet from her supervisor, giving full view of Ms. Mata's computer screen.  Decl. of Victorina Mata ¶ 14.

Defendants attempt to hide these facts by presenting a series of half statements about who knew what, essentially asserting that no one knew anything "No one hears the tree [fall]."  Defs. Mot Summ J. p.9.  Ms. Mata had discussed these exact issues with Ms. Kaufmann, and Ms. Wentz herself even admitted that she and Ms. Kaufmann discussed whether Ms. Mata was the whistleblower to the Secretary of State.  Wentz Dep. 169:10-19.  Exhibits showing communications between Defendant Wentz and Defendant Kaufmann explicitly prove that Wentz and Kaufman both knew and discussed Ms. Mata's whistleblowing.  One document literally includes Ms. Kaufman saying, "I believe he [Gallia] is who she [Mata] has been having side conversations with about HK data." Wentz Dep. 152:21-23.   Another time, Defendants Wentz and Kaufman discuss that they think it was Plaintiff that leaked the information to the Secretary of State.  Wentz Dep. 169:9-21.

Defendants conveniently leave out the fact that Ms. Kaufmann was extremely upset when she discovered the Oregonian article claiming wasteful spending within Healthy Kids, and she believed the informant was someone inside Healthy Kids.  Decl. of Tyler Smith, Ex. 11 ("Hansell Dep.") 133:1-10, 23-29; 134:1-9.   Testimony is already uncovered that will prove that after she complained, Ms. Mata was subjected to a series of escalating efforts by the Defendants to keep her in the dark by moving her office away from Charles Gallia and ultimately to a desk directly in front of Patty Wentz. Mata Dep. 75:8-10; Decl. of Victorina Mata ¶ 13-14.  Ms. Mata was then promptly removed from meetings by Defendants.  Aff. of Amber Marcus ¶¶ 5-7.  Ms. Mata was forcefully interrupted and stopped by Defendant Hansell and other managers from discussing these complaints at meetings. Aff. of Amber Marcus ¶6.  Multiple witnesses were

17   **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

there. Id.  Ms. Mata relayed her concerns to a local state representative who inquired with Defendant Kaufmann.  Decl. of Victorina Mata ¶ 11.  Ms. Mata informed Defendant Wentz specifically about the same kind of improper payment activities and accounting irregularities in an e-mail on September 21, 2010.  Mata Dep. Ex. 118.  The same problems were then reported to other people in the agency accounting department and ultimately the media.  Mata Dep. Ex. 119. Ms. Mata even reported her concerns to the Deputy Director of Administrative Services in November of 2010.  Mata Dep. 214:1-10.  Plaintiff had already been talking to her superiors, her co-workers, other agency heads, other state agencies, the federal government, and the media about her concerns about double payments, improper inflating of enrollment numbers, intentionally changing formulas and definitions to falsely report positive results, no-bid contracts, refusing to turn documents over in response to public records requests, and intentionally preventing employees from taking notes in order to leave no evidence.  Decl. of Victorina Mata ¶ 33.

Accordingly, there is a large volume of evidence that suggests, if it does not affirmatively prove, that Defendants knew of Plaintiffs whistleblowing activities and took actions to prevent it, and then retaliate against Ms. Mata.

   **b.  Defendants erroneously argue that Plaintiff does not qualify for whistleblower protection under Counts 1 and 2 of Plaintiff's First Claim for Relief.**

      **1.  Plaintiff's allegations show mismanagement, gross waste of funds, and abuse of authority which are each independently sufficient to afford her protections as a whistleblower under the relevant statutes.**

Defendants' argument attempts to lump all of Plaintiff's whistleblowing activity into the single category of "mismanagement."  Defendants go on to claim that Plaintiffs allegations fail to show mismanagement as a matter of law.  Then, Defendants further attempt to characterize the

18   **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

whistleblowing as relating to only the topics of "misstating the number of uninsured children" and "billing problems." Defs.' Mot. For Sum J. p.23. Defendants' premise is false. The characterization of Plaintiff's allegations is wrong, and correspondingly their analysis is grossly misapplied to the facts of this case.

First, Plaintiff's First Claim for Relief, counts 1 and 2 are brought under ORS 659A.203 and ORS 659A.199. Respectively those statutes contain similar prohibitions on employers making it an unlawful employment practice to:

> (b) Prohibit any employee from disclosing, or take or threaten to take disciplinary action against an employee for the disclosure of any information that the employee reasonably believes is evidence of:
> (A) A violation of any federal or state law, rule or regulation by the state, agency or political subdivision;
> (B) Mismanagement, gross waste of funds or abuse of authority or substantial and specific danger to public health and safety resulting from action of the state, agency or political subdivision;

Or:

> to discharge, demote, suspend or in any manner discriminate or retaliate against an employee with regard to promotion, compensation or other terms, conditions or privileges of employment for the reason that the employee has in good faith reported information that the employee believes is evidence of a violation of a state or federal law, rule or regulation.

Thus, not only is it unlawful to terminate the employee for disclosing the evidence relating to these issues, it is and was unlawful to discipline Ms. Mata in any of the ways listed under ORS 659A.200 including, "any **discrimination**, **dismissal**, **demotion**, transfer, **reassignment**, **supervisory reprimand**, warning of possible dismissal or **withholding of work**, whether or not the action affects or will affect employee compensation. (bold added).

To prove that an employee was terminated on unlawfully discriminatory grounds,

"[i]t is sufficient in Oregon for the plaintiff to show that unlawful motive was a substantial and impermissible factor in the discharge decision. *Huber v. Or. Dep't of Educ.*, 235 Or. App. 230, 240-241 (2010). The Oregon Court of Appeals has previously noted that a plaintiff's *prima facie* burden in an employment discrimination case is so minimal that it is virtually impervious to a motion based on evidentiary sufficiency." Id citing *Herbert v. Altimeter, Inc.,* 230 Or. App. 715, 722, 218 P.3d 542 (2009) (internal citations and quotation marks omitted; brackets in original).

Plaintiff's complaint outlines and alleges various types of wrongful activity that Ms. Mata discovered, disclosed to her superiors, discussed with her peers, reported to other officials in her agency and with the state, escalated to the Secretary of State Audits division, reported to the state and federal Departments of Justice, and disclosed to the media. Second Amend. Compl. ¶ 12. Those complaints and wrongful activities she disclosed include abuse of authority, gross waste of funds, mismanagement, fraud, embezzlement, violations of state rules, and other practices that Ms. Mata and other peers believed were wrongdoing. See Mata Dep. p 46. Defendant also erroneously contends that there is no causal connection between Plaintiffs escalating complaints and whistleblowing and the adverse employment actions and actionable disciplinary actions. They go so far out on a limb to argue that they didn't even know about the whistleblowing. Def. Mot. Summ. J. p. 21. Such claims are patently false on the face of Defendants own statements. Defendant Wentz admitted in her deposition that she and Defendant Kaufman had conversations about whether or not Ms. Mata initiated the Secretary of State audit. Wentz Dep. 169:1-21. Defendants' own brief proves that there is strong evidence contrary to their position and in favor of Ms. Mata's as Defendants try to discount the level of training of their own employees, Mr. Gallia, and Ms. Hanks and discount the data which they had been using for years. Defs. Mot. Summ J. 5. Defendants dismiss Mr. Gallia's concerns regarding the

enrollment and uninsurance numbers because his "graduate degree was not in statistics or

mathematics, but in public administration" and because "he did not work for the office

responsible for forecasting."  Defs. Mot. Summ J. 5.   In fact, Mr. Gallia has a Ph.D. in public

administration. Gallia Dep. 8:11-17.  He has years of experience in conducting surveys and

formulating data, and part of his job at the relevant time was working on a committee producing

"estimates of the impact of enrollment, and what effects it would have on the budget."  Gallia

Dep. 11:16-24.  The committee included someone from the office of forecasting, and Mr.

Gallia's job was "determine…the potential number of children [Healthy Kids] could help."

Gallia Dep. 13:2-10.  Mr. Gallia had been producing enrollment numbers for the State of Oregon

to be reported to the federal government for CHIP (Children's Health Improvement Program)

and Medicaid since 2001, and in almost ten years, no one had ever rejected his numbers.  Gallia

Dep. 27:13-28:21.  Both Hanks and Gallia had the same opinion about the improper use of false

enrollment numbers and uninsured numbers being used.  Gallia Dep. 19-23; Hanks Dep. 36:1-24.

Ms. Hanks even confronted Defendant Kaufman about it and told Ms. Kaufmann that if things

did not change she would quit. Hanks Dep. 37:16-25.  Ms. Hanks' deposition testimony explains

that Ms. Kaufman got confrontational and defensive about the matter, put her hands on Ms.

Hank's desk, moved extremely close to Ms. Hanks leaning forward into her personal space,

about six inches away, raised her voice in a very sharp tone and made Ms. Hanks fear for her job

and fear for her relationship with her own boss.  Hanks Dep. 38-40.  Ms. Hanks, Mr. Gallia, Jean

Phillips and Sean Kolmer had all counseled Ms. Kaufmann that the numbers could not be used

interchangeably.  Hanks Dep. 42:14-22.  Ms. Kaufmann would change the numbers depending

on who the audience was and use the numbers that would make her program look best.  Hanks

Dep. 43:7-15.  Ms. Mata informed Ms. Hanks that she had blown the whistle to the Secretary of

State and the media about the fact that the numbers needed to be looked at, and Ms. Hanks

agreed with Ms. Mata.  Hanks Dep. 46:10-47:6.

Defendants contend that Plaintiffs complaints were not reasonable and act as if Ms. Mata

was the only person interested in or complaining about the wrongdoing.  The facts, documents

and witnesses say differently.  Contrary to Defendants assertions there is plenty of evidence for a

jury to find in favor of Ms. Mata that these discipline actions did happen.  First, there is no

dispute that her functions and duties were taken away, that she was excluded from meetings, or

that she was terminated.  On its face the evidence also shows a heavy probability and that they

were caused by her internal and external whistleblowing.  Ms. Mata filed her tort claim notice on

February 9, 2012 and her BOLI complaint on February 27, 2012.  Mata Dep. 248:13-17.  Ms.

Mata was given her termination notice less than one month later on March 14, 2012, with her last

day April 13, 2012.   During that period of time, the agency officials, specifically Ms. Kaufman

had the opportunity to select who she wanted to terminate and conveniently it was the two people

that she and Defendant Wentz thought had initiated the Secretary of State Audit.  Wentz Dep.

169:6-21 (Kaufman and Wentz discussing who initiated the audit); Smith Decl. Ex. 1 ¶¶15-20

(explaining the selection of who was terminated was not dictated by the legislature).  Even in the

face of that admission, Defendants' outrageously argue that, "Ms. Wentz had no idea where the

Secretary of State got its information".  Defs' Mot Summ. J. p 21.  Nonetheless Plaintiff and the

other person Defendants suspected were leaking information on this wrongdoing were the only

two that were selected for layoff.  Ms. Rux filed her own employment claim on different grounds

and in that case the state admitted/argued that it had options on selecting who they laid off, yet in

this case they insist it had to be these two people.  Decl. of Tyler Smith Ex. 1, ¶¶ 15-20.

22    **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT**

Even if Ms. Mata's testimony was completely ignored (which it cannot be in a summary judgment), enough evidence to survive summary judgment comes from other witnesses. For example, Ms. Hanks raised the exact same issue about the use of numbers in public reports that were not accurate numbers based on what the agency produced. Hanks Dep. 36:1-4. She ultimately quit over it. Hanks Dep. 36:23-24. Mr. Gallia repeatedly raised these concerns. Gallia Dep. 21-23.

The Secretary of State obviously thought the complaints and problems that Ms. Mata blew the whistle on were "reasonable." In fact they investigated them and found even more wrongdoing even though they didn't even fully investigate all the problems. Hanks Dep. 47:1-48:4. The Secretary of State concluded that OHA had been "awarded approximately $4.6 million more than warranted." Mata Dep. Ex. 129. Gene Evans and Patty Wentz specifically talked about the fact that Ms. Mata's complaints were the same as those brought forward in the Secretary of State's audit. Mata Dep. 258:12-18; Evans Dep. 19:15-17. The Secretary of State's own audit states that "State rules and policies provide requirements and recommended practices for agencies to follow during procurement of and payment for goods and services". Mata Dep., p.55, Ex. 129.

Multiple people reviewed and concluded that Ms. Mata found and successfully pointed out accounting irregularities, double payments, payments to vendors who had not even performed work, vendors who were being paid without anyone verifying they had performed their work, no-bid contracting (Mata Dep. p. 50-60, Ex. 129; p.61-64, Ex. 131; Decl. of Tyler Smith Ex. 7, Evans Dep. 15:1-19), and abuse of authority in renewing contracts of Application Assister Grantees who did not perform. For instance one grantee received $70,000 and only helped with two applications. Decl. of Victorina Mata ¶ 32. Ms. Mata blew the whistle on that

issue as well as a similar one related to the Urban League.  Just that one controversy itself resulted in four different news stories.  Decl. of Victorina Mata ¶ 32.

Unbelievably, Defendants suggest that hundreds and hundreds of thousands of wasted dollars, no-bid contracts, double payments for services, and millions of dollars wrongly charged to the federal government was insubstantial.  A jury could most certainly find differently.   The media certainly believed Ms. Mata's concerns and the topics she blew the whistle on were "reasonable" and legitimate enough violations to run dozens of stories on these issues.  Decl. of Victorina Mata ¶ 31   Ms. Kaufman was furious over some of these disclosures (Hansell Dep. 133:1-10, 23-29; 134:1-9), and her job was even on the line if some of the issues like the Urban League problem were not fixed.  Decl. of Victorina Mata ¶ 32.

Defendants' argument cannot withstand scrutiny.  Defendants did know about Ms. Mata's complaints, concerns and whistleblowing.  Defendants were aware of the news stories coming out about internal matters.  Even the "neutral" Secretary of State found that State rules and policies applied to Defendants' actions and the very same things Ms. Mata blew the whistle about.  Defendants were angry at the disclosures and even worried the publicity would ultimately destroy the entire program.  The problems Ms. Mata was attempting to rectify were outside of her control, but she and others that sought to stop this wrongdoing were silenced.  Ms. Mata was fired shortly after she filed her BOLI claim that outlined most of the disclosures she had made.

> **2. Plaintiff is entitled to a jury trial under ORS 659A.885 thus Defendants' argument that no jury trial is available under one of the three counts in Plaintiff's First Claim for Relief is both moot and erroneous.**

ORS 659A.885 establishes that without question Plaintiff has a right to a jury trial on her claims made under ORS 659A.199 (Count 1) and ORS 659A.230 (Count 3).  Subsection three of that statute explains:

24  **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

> In any action under subsection (1) of this section alleging a violation of ORS 25.337, 25.424, 659A.030, 659A.040, 659A.043, 659A.046, 659A.069, 659A.082, 659A.103 to 659A.145, 659A.199, 659A.228, 659A.230, 659A.250 to 659A.262, 659A.290, 659A.318 or 659A.421:
>
> > (a) The court may award, in addition to the relief authorized under subsection (1) of this section, compensatory damages or $200, whichever is greater, and punitive damages;
> > (b) At the request of any party, the action shall be tried to a jury;

Plaintiff has demanded a jury trial so we know the facts relating to those claims, and the civil rights claim will be tried by a jury.  The only question is whether the same facts will also be tried by the court for Count 2 under ORS 659A.203, thus severing the same facts to two different finders of fact in the same case.  The facts for Count 2 should also be tried by the jury.  In analogous case law, when tried at the same time, facts relevant to the 659.199 or 659A.230 elements preclude a different finding by the judge even under the 659A.203 claim.  [W]here legal claims are tried by the jury and equitable claims tried by the court are 'based on the same set of facts, the Seventh Amendment requires the trial judge to follow the jury's implicit or explicit factual determinations.'" *Sanders v. City of Newport*, 657 F.3d 772 (9th Cir. 2011), (quoting *Miller v. Fairchild Indus., Inc.*, 885 F.2d 498, 507 (9th Cir. 1989) "Accordingly, we hold that, on remand, the district court in deciding the [equitable] claim will be bound by all factual determinations made by the jury in deciding the [legal] claims.")).  *See also Hunt v. City of Portland*, 2011 U.S. Dist. LEXIS 64068 (D. Or. June 16, 2011)(applying 659A.203 and 659A.230).  The same rules should apply here to have any duplicate fact issues decided by the jury.

> **c.  Plaintiff caused various complaints to be filed against the Defendants and others and is thus protected by ORS 659A.230.**

25  **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants erroneously contend that Count 3 of Plaintiff's complaint cannot proceed because they allege that Plaintiff did not file a complaint to be filed against any person before she was retaliated against and that Plaintiff did not report criminal activity or file a "civil action" prior to the retaliation acts.   Defendants are wrong on both counts.  Defendants discussed and acknowledged discussing that it was Plaintiff who filed the complaint initiating the audit by the Secretary of State.  Wentz Dep. 169:1-21.  In her own documents Defendant Kaufman even states "that there has been a complaint to the Secretary of State hotline regarding Healthy Kids that the SOS is going to look into." Mata Dep. Ex 126.  Thus, Plaintiff clearly filed a complaint, even filed multiple complaints against Defendants.

Second, Defendants allege that filing a BOLI claim is not a "civil proceeding" by citing two cases that do not stand for that proposition.  A simple review of *Huber,* 235 Or. App. 230 shows that the Plaintiff in that cases reporting of the concern to an administrative agency by itself did not trigger a 659A.230 because it was nothing like a civil matter.  The other case *Mantia v. Hanson* does not rule upon or even apply ORS 659A.230.  *Mantia v. Hanson*, 190 Or. App. 36 (2003).  Ms. Mata filed a BOLI Complaint which is heard and tried like a civil lawsuit for penalties and damages.  Ms. Mata reported the activities to both state and federal criminal investigative bodies.  Mata Dep. p. 49, Ex. 125; Mata Dep. p. 65 Ex.132.  This because Ms. Mata did report potentially criminal activity and did cause a complaint to be filed in BOLI, the facts show that she is covered by ORS 659A.230 and a jury should be able to decide whether it was violated or not.

**IV.    Plaintiff has presented genuine questions of material fact showing that Defendants unlawfully abridged her First Amendment freedom of speech.**

The Court may only grant a motion for summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56. In their Motion for Summary Judgment, Defendants have omitted key facts and presented an incomplete legal analysis of Plaintiff's First Amendment claim. Defendants' wildly overbroad and unsupported assertions that no evidence exists to support Plaintiff's First Amendment Claim are patently false. Defendants' statement and application of the law on Plaintiff's First Amendment claim is also wrong.

In *Pickering v. Bd. of Educ.,* 391 U.S. 563 (1968), the Supreme Court first established the balancing test we apply to claims of First Amendment violations in the public employment context. This test has evolved into a more precise step-by-step inquiry since the *Pickering* decision, but the general rule remains true that "the state may not abuse its position as employer to stifle 'the First Amendment rights [its employees] would otherwise enjoy as citizens to comment on matters of public interest.'" *Eng v. Cooley,* 552 F.3d 1062, 1071 (9th Cir. 2009) (quoting *Pickering*, 391 U.S. at 568). To prove a violation of Plaintiff's First Amendment right to free speech in this context, Plaintiff must show that her speech addressed an issue of public concern, that the speech was spoken in her capacity as a private citizen and not as a public employee, and that the Plaintiff's speech was a substantial motivating factor in some adverse employment action. *Eng*, 552 F.3d at 1062. Once Plaintiff makes such a showing, Defendants must show that some state interest outweighed Plaintiff's First Amendment rights. If the Defendants cannot show some state interest which outweighs Plaintiff's First Amendment rights, then, to prevail, they must alternatively show that Plaintiff's discharge was actually based on some other proper and legal reason that, by itself, would have been sufficient to warrant Plaintiff's discharge. *Id.* at 1072.

27    **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

a. **Plaintiff's speech was a matter of public concern.**

Speech is a matter of public concern unless it deals with 'individual personnel disputes and grievances" that would be of "no relevance to the public's evaluation of the performance of governmental agencies." *Robinson v. York*, 566 F.3d 817, 822 (9th Cir. 2009) (quoting *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 2006)). "Misuse of public funds, wastefulness, and inefficiency in managing and operating government entities are matters of inherent public concern." *Johnson v. Multnomah Cnty*, 48 F.3d 420, 425 (9th Cir. 1995). Speech which "bring[s] to light actual or potential wrongdoing or breach of public trust" is even given more protection. *Connick v. Myers*, 461 U.S. 138, 148 (1983).

As a preliminary matter, Defendants apparently consider only Plaintiff's speech to the Secretary of State, the Department of Justice, and the media to be relevant protected speech. However, speech is not just protected when it is made to the media or some other outside source. *Ulrich v. City & Cnty of S.F.*, 308 F.3d 968, 979 (9th Cir. 2002). Indeed, even speech made to a co-worker or supervisor is subject to First Amendment protection and may not be stifled by the state employer. *Id.* ("the public employee does not forfeit protection against governmental retaliation because he chose to press his cause internally."); *Garcetti v. Ceballos*, 547 U.S. 410, 420 (2006) ("That [the plaintiff] expressed his views inside his office rather than publicly, is not dispositive. Employees in some cases may receive First Amendment protection for expressions made at work."). Thus, the main thrust of Defendants' argument that they did not know that Plaintiff made reports to the Secretary of State, the Department of Justice, and the media is of little consequence. Defendants most certainly knew in 2009 that Plaintiff was questioning the uninsured and enrollment figures being used and reported by the Agency and Defendants new in

2010 that Plaintiff had questioned the billing and paid advertising approvals and procedures. This speech is by itself enough to warrant First Amendment protection.

Here, Plaintiff's protected speech began in 2009 when she voiced her initial concerns to Defendants Patty Wentz and Cathy Kauffman that the uninsured numbers and enrollment figures were artificially inflated. She stated in an email to Defendant Wentz that "I looked into the 104,000 uninsured children number and learned that the number is half-baked. I do not believe it is a number to be transparent, defensible, or credible, yet I am feeling pressured to use it." Mata Dep. 131:7-17. In that email, she also stated that "another concern is if we agreed to use [the] 104,000, it does not tell the whole story that since July, 2008, approximately 41,000 kids have been enrolled in the Oregon Health Plan. Anyone can do the math, and it would have the appearance we are trying to beef up the number." Mata Dep. p. 35, Ex. 114. In 2010, she confronted Defendants Wentz and Kauffman about irregular accounting practices in in the marketing and advertising budget. Mata Dep., p.36, Ex. 118. Later, she went to the Secretary of State, the Department of Justice, and the media with her concerns, and Defendants Kauffman and Wentz knew. Mata Dep. 207:12-15; 172-175; Wentz Dep. 169:10-19.

Defendants argue that Plaintiff's speech was not a matter of public concern because "her main motivation was her own credibility" and because Defendants believe her concerns were unfounded. Defendants are wrong. First, Plaintiff's speech regarding the percent of uninsured children was focused on her belief that the agency had artificially inflated numbers in order create a "need" so the legislature would pass the Healthy Kids legislation and later, her belief that the inflated the enrollment figures to receive additional federal funds and wrongfully garner public support through false statements. Mata Dep. 287:9-12; 323:9-12. Like in *Connick*, this speech "bring[s] to light actual or potential wrongdoing or breach of public trust" and is subject

29    **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

to even higher protection. *Connick v. Myers*, 461 U.S. 138, 148 (1983). Plaintiff's speech

regarding the irregular accounting practices directly relates to the misuse of public funds and is a

matter "of inherent public concern." *Johnson v. Multnomah Cnty*, 48 F.3d 420, 425 (9th Cir.

1995). Plaintiff's speech was not directed at some personnel matter, job performance, or

condition of employment. *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 766 (9th Cir. 2006).

Plaintiff's speech directly attacked the way the agency was portraying to the public and to the

federal government facts which she and numerous other employees believed were false. It also

brought to light accounting practices which even the Secretary of State confirmed needed to be

more tightly controlled. Mata Dep. p, 50-55, Ex. 129. That Plaintiff was also concerned that

making publicly false statements would damage her credibility professionally does not change

the fact that her speech was a matter of public concern.

In addition, Defendants' claim that Plaintiff's concerns were unfounded should not affect

this Court's determination of whether the speech was a matter of public concern. Defendants

misconstrue the law on this issue. In *Johnson v. Multnomah Cnty*, the defendant county argued

that the plaintiff's statements were false and thus deserving of no constitutional protection. The

Ninth Circuit Court disagreed and held that "Recklessly false statements are not per se

unprotected by the First Amendment when they substantially relate to matters of public concern.

Instead, the recklessness of the employee and the falseness of the statements should be

considered in light of the public employer's showing of actual injury to its legitimate interests."

*Johnson v. Multnomah Cnty*, 48 F.3d 420, 424 (9th Cir. 1995). In so holding, the Court stated

that

> There is a significant First Amendment interest in encouraging public employees,
> who have special access to facts relevant to debates on issues of public concern,
> to speak freely and make that information available. There is a real danger that

30  **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT**

stripping all First Amendment protection from recklessly false statements may inhibit the flow of accurate information from public employees who are uncertain about whether they have accumulated a legally sufficient factual basis for their statements. A more cautious approach is in order, an approach that considers the actual damage done to the government by the reckless statement, whether anyone believed the statements, whether the government could easily rebut the false statements, etc.

*Id.* (Citations omitted).

As a preliminary but important matter, Plaintiff's speech was not false. The Secretary of State performed an audit of the Healthy Kids enrollment and found that the agency had, in fact, wrongly reported its numbers to the federal government resulting in an undeserved federal bonus of around 4.5 million dollars. Mata Dep. p.50-55, Ex. 129. In addition, the Secretary of State's audit found that the accounting practices should be tightened to prevent misuse of funds in the other ways Ms. Mata complained about. *Id*. Defendants even acknowledge that Plaintiff's concerns regarding irregular accounting practice did result in the recoupment money. Defs. Mot. Summ. J. p. 30. Yet, completely without legal basis, Defendants argue that this misuse of funds was *de minimus* ("it involved only a few hundred dollars") and such a "minor matter" that is "fail[s] to rise to the level of receiving constitutional protection." Defs. Mot. Summ. J. p. 30. Defendants apparently ask this Court to strip public employees of their First Amendment speech concerning government misuse of funds where the government's misuse of taxpayer money only involves "a few hundred dollars." Defendants' categorization of the agency's "*de minimus*" misuse of funds brings front and center their dismissive and arrogant handling of Plaintiff's concerns from the beginning. Defendants argue that because Defendant Kauffman told Plaintiff that there was no misuse of funds and that the enrollment numbers and uninsured figures were correct, Plaintiff had no constitutionally protected right to continue pursuing a closer look and holding the agency accountable to the public. Defendants dismiss the results of the Secretary of

31  **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

State's audit as if it exonerated the agency from any wrongdoing and proved Plaintiff entirely

wrong when in fact the audit revealed a mistake in the numbers Healthy Kids reported to the

federal government which resulted in a $4.5 million surplus to the agency.  The audit also found

problems with the Healthy Kids' accounting and recommended that it "strengthen its controls

over the Healthy Kids advertising expenditures" by implementing six specific accounting

practices.  Mata Dep., p. 50-55, Ex. 129.  In truth, the evidence shows that Ms. Mata's

complaints and whistleblowing related to far more than just the 4.5 Million, or the $10,000 pre-

payments for services, or the contract awards given without bids, but also included fraudulent or

embezzlement type payments to "Grantee" organizations that were receiving funds as application

assisters to help sign people up for insurance.  One received $70,000 for helping two applicants

fill out their forms.  Decl. of Victorina Mata ¶ 32.  Another, the Urban League, was all over the

newspapers in multiple stories for wasting funds, using funds for improper purposes and other

wrongdoing.  Decl. of Victorina Mata ¶ 32.  Another of the main concerns that Ms. Mata blew

the whistle on was the hiding of the full program budget from the media.  Ms. Kaufman was not

disclosing the full budget and expenditures for outreach and marketing.  Decl. of Victorina Mata

¶ 33.  That dispute goes to the heart of Defendants' pre-text for terminating Ms. Mata.

Contrary to Defendants' arguments, Plaintiff's speech that the agency was misleading the

public and misusing funds did not have to be confirmed in order to be constitutionally protected.

To the contrary, "there is a significant First Amendment interest in encouraging public

employees, who have special access to facts relevant to debates on issues of public concern, to

speak freely and make that information available." *Johnson v. Multnomah Cnty*, 48 F.3d 420,

424 (9th Cir. 1995).  The Ninth Circuit has specifically warned that "there is a real danger that

stripping all First Amendment protection from recklessly false statements may inhibit the flow of

32   **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT**

accurate information from public employees who are uncertain about whether they have accumulated a legally sufficient factual basis for their statements." *Id.*  In this case, Plaintiff's statements led to the agency's recovering hundreds of dollars, stop wasting tens of thousands of dollars, revamping its accounting practices, and adjusting its federal bonus award by nearly $4.5 million dollars because of overstated enrollment.  Certainly Plaintiff's speech was a matter of public concern protected by the First Amendment.

### b.  Plaintiff spoke in her private capacity

Defendants concede that Plaintiff spoke in her private capacity as they make no argument to the contrary and even assert that Plaintiff's questioning of the enrollment numbers was outside the scope of her job description.  Defs. Mot. Summ. J. p.5-6.  Plaintiff's speech regarding accounting irregularities was also not made as a part of her official job duties because Defendant was not part of the financial services unit.  Dep. of Cathleen Kaufmann, 126:15-19.  Defendant Kauffman stated that she and Plaintiff had conversations about Plaintiff's concerns regarding irregular accounting between two and five times (Kauffmann Dep. 127:9-19) and that Defendant Kaufmann worked with Jeremy Emerson to correct any potential problems.  Ms. Mata was not involved in making those changes.  Decl. of Victorina Mata ¶ 24.  Reporting no-bid contract practices, alerting the secretary of state of wrongdoing, and leaking wrongfully withheld public records to the media were also not in Ms. Mata's job duties.  Clearly Plaintiff's approaching the Secretary of State, the Department of Justice, and the media about her concerns was not a part of Plaintiff's job duties.

### c.  Plaintiff was subjected to adverse employment action because of her protected speech.

33  **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

In spite of Defendants characterization of Plaintiff's very real suffering as "the trivialities of day-to-day employment," Plaintiff has presented a genuine question of material fact as to whether Defendants acted in retaliation to Plaintiff's protected speech. Defs. Mot. Summ. J. p. 32. Defendants attempt to characterize their actions taken against Plaintiff as nothing more than usual workplace drama, but Plaintiff has presented evidence upon which a reasonable jury could rely that Defendants actions were more than this. See *Supra* pp. 1-4

Defendants claim repeatedly that they were "unaware of the speech" and therefore they could not possibly have retaliated against Plaintiff. Defs. Mot. Summ. J. p. 31. However, the facts show a different story. Plaintiff sent an email to her supervisor Defendant Patty Wentz on November 9, 2009 voicing her concerns about potentially "half-baked" uninsurance numbers. Mata Dep. p.31, Ex. 118. Defendant Wentz immediately forwarded this email to Defendant Cathy Kauffman. Wentz Dep., p.7-8. Defendant Kauffmann responded to Plaintiff's email stating that she was "misinformed" and that she had already explained this to Plaintiff the previous week. *Id.* Defendant Kauffmann went on to state that "there are ongoing issues with Charles Gallia in DMAP research and his beliefs regarding what number we should be using (he prefers CPS data – another variation on the theme of federal data), but he would agree that Vikki's assumptions here are wrong. I assume he is who she has been having side conversations with about HK data." *Id.* Defendant Kauffmann herself admits that she knew Plaintiff and another employee of DHS, Charles Gallia, were questioning the number of uninsured children that Healthy Kids was presenting to the public. Kaufmann Dep.. 91: 22-25; 92: 1-9. Again in September of 2010, Plaintiff sent an email to Patty Wentz regarding irregular accounting practices. Defendant Kauffmann was aware of Plaintiff's concerns as stated in that email.

Indeed, she admitted in her deposition that Plaintiff had raised similar concerns to her between two and five times.  Kaufmann Dep. 127:9-19.

Whether Defendants knew that Plaintiff made her complaints known to the media, to the Secretary of State, and to the Department of Justice is a genuine question of fact for trial although the record is bursting with evidence that Defendants had knowledge.  *See supra* Sec. III A.  We know for a fact they knew after Plaintiff filed her BOLI complaint in February of 2012 and before Ms. Mata was terminated in April of 2012.  As cited above, the Secretary of State's audit concerned exactly the issues that Plaintiff had raised multiple times with Defendants Kauffman and Wentz.  Although Plaintiff asked the Secretary of State to maintain her anonymity, she was warned by the Secretary of State's office that it was likely that Defendants would know she was the whistleblower because she had voiced the same concerns to them on multiple occasions.  Defendant Wentz even admits that she and Defendant Kaufmann discussed whether Ms. Mata was informant to the Secretary of State.  Wentz Dep. 169: 10-19. Defendants Kauffmann and Wentz absolutely were aware of Plaintiff's concerns starting in 2009 because Plaintiff voiced her concerns to Defendants directly at that time.  Defendants admit that Plaintiff continued to voice these concerns which became the exact subjects of the audit and media inquiries.  It was made clear to employees there in no uncertain terms, that Ms. Kaufman and Ms. Wentz were not to be doubted or questioned.  Decl. of Victorina Mata ¶13; Feeny Dep. 22:10-13; Hanks Dep. 49:9-20.  Even as late as early 2012, Defendants were attempting to block Ms. Mata from information and excluding her from meetings she would have otherwise been invited to.  Aff. of Amber Marcus ¶¶ 4-6.  Plaintiff has presented genuine issues of material fact showing that Defendants were aware of Plaintiff's protected speech and that they engaged in a series of systematic acts of retaliation against Plaintiff in response.

35   **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**d. Defendants have not provided any relevant factual analysis showing that some state interest outweighed Plaintiff's First Amendment rights.**

Defendants deny that any of their actions were retaliatory and fail to provide any facts or arguments showing why their actions outweighed Plaintiff's free speech rights. Defendants instead assert that Plaintiff's claims that Defendants' actions short of terminating her were mere trivialities. Defs. Mot. Summ. J. p. 31. There is conflicting testimony regarding the reasons for Defendants' actions short of terminating Plaintiff, and there is a genuine issue of material fact as to whether Defendants acted in retaliation toward Plaintiff because of her protected speech. Defendants claim that Plaintiff was not fired in retaliation for her speech but that she was fired because "the Legislature cut the entire Healthy Kids marketing budget and all funds associated with it." Defs. Mot. Summ. J. p. 14.

First, that argument does not cover or excuse them from the other retaliatory acts, and Second it is simply a pretext contrived after Plaintiff filed her BOLI complaint. Defendants claim that the Legislative budget cuts "zeroed out plaintiff's job" and that and that "no one at OHA had any ability to reach a different outcome." The Parties agree that the Legislature cut a portion of the marketing budget for OHA; however, the Legislature's committee notes show that the marketing budget for Healthy Kids was only cut by $1 million. Decl. of Tyler Smith Ex. 2. Defendant Kauffman stated that the budget for marketing and outreach at Healthy Kids was roughly $5.5 million. Kaufmann Dep. 106: 19-23. The budget also had carryover funding. Mata Dep. p. 69, Ex. 138. Further, although Defendants now claim that they had no choice at all in whether to terminate Plaintiff's position, Defendant Kauffman stated clearly in her deposition, that it was her decision to lay off Plaintiff. Kaufmann Dep. 162-163. Defendant Kauffmann stated that because the "healthy kids budget, overall, had been cut dramatically, and that [she]

36   **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

had been directed by [her] boss to make cuts that were commensurate" and that resulted in her decision to fire Plaintiff and Valerie Rux without providing a layoff plan of any kind.  Kaufmann Dep. 162: 22 -163: 9.  Defendants argue in their Motion for Summary Judgment that the Legislature directed Healthy Kids to eliminate Plaintiff's position by cutting the entire marketing budget.  However, Defendants' own testimony shows that to be untrue.  The Legislature may have cut the budget, but it did not eliminate the entire marketing budget, and it did not specifically cut Plaintiff's position. Decl. of Tyler Smith, Exhibit 1 ¶¶15-20.  Defendant Kauffman made the decision to terminate Plaintiff and Valerie Rux – the two employees who had questioned Defendant Kauffman from the very beginning. Id.  Defendants did not even follow the agency's "core values" to help internal employees find replacement work inside the agency.  Decl. of Victorina Mata ¶43.  Defendants are not entitled to summary judgment at this stage because there is a clear issue of material fact as to why Ms. Kauffman cut Plaintiff's position, and Defendants' fingerpointing at the Legislature does not eliminate this question of fact.

e. **Defendants' argument that Plaintiff would have been fired because of conduct Defendants later discovered is legally irrelevant**.

Defendants misunderstand the legal standard on this element when they wrongly assert that Plaintiff "gave good cause for termination" and "had [her actions] become known at the time they occurred, she would have been terminated."  Defs. Mot. Summ. J. p. 32.  Defendants argue that some alleged wrongdoing which was discovered *after* Plaintiff was fired and which *had no bearing* at all on Defendants' decision to fire Plaintiff is sufficient to completely bar Plaintiff's First Amendment retaliation claim. ("Because Plaintiff would have been removed for an unactionable reason, a First Amendment claim may not stand."  Defs. Mot. Summ. J. 34.)

37    **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants are wrong.  While it is true that a state may overcome an employee's First

Amendment retaliation claim by proving that it had some other legitimate basis for taking action

against an employee, the state in such a case must show that some other interest *actually did*

motivate it to take the offending action.  This is known as the "mixed motives" test.  *See Eng*,

552 F3d at 1072; *See also Mt. Healthy City Sch. Dist. Bd. Of Educ. v. Doyle*, 429 U.S. 274, 287

(1977).  The question under the mixed motives test is "whether the 'adverse employment action

was based on protected and unprotected activities,' and if the state "would have taken the

adverse action if the proper reason alone had existed." *Eng*, 552 F3d at 1072 (quoting

*Knickerbocker v. City of Stockton*, 81 F.3d 907 (9th Cir. 1996).  Here, Defendants claim that

evidence they discovered *after* Plaintiff was fired would have *in hindsight* been a proper reason

for her termination.  But that fact is completely irrelevant to the legal standard at issue here.

Because Defendants did not discover Plaintiff's alleged wrongdoing until after she was fired, the

alleged wrongdoing could not possibly have motivated the Defendants to take the action Plaintiff

claims violated her First Amendment right to free speech.  Defendants argue that the agency

"believed that plaintiff's acts harmed her performance of duties" and state emphatically that

"although plaintiff may quibble about whether it is reasonable that OHA would have found her

actions crippled her effectiveness, she cannot refute that he did so find."  Defs. Mot. Summ. J. p.

33.  The important point Defendants miss is that in order for such a finding to have any relevance

to Defendants' defense, OHA needed to have at least in part based its termination of Plaintiff on

the alleged misconduct.  Here, defendants readily admit "the OHA does not suggest that plaintiff

was released for substandard performance.  It only notes that the budget required the move."

Defs. Mot. Summ. J. p. 32.  By their own admission, Plaintiff's alleged misconduct did not

motivate Defendants' retaliatory action and Defendants' assertion to the contrary must fail.

38   **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY
     JUDGMENT**

## CONCLUSION

There are disputed questions of material fact on all of the relevant questions of ultimate fact.  The legal positions that Defendants take are wrong as a matter of law and otherwise do not justify the granting of Summary Judgment.  Defendants' motion should be denied.

Dated: February 2, 2015

Tyler Smith & Associates, P.C.

/s/ Tyler Smith_____
Tyler Smith (OSB# 075287)
Attorney for Petitioner
Tyler Smith & Associates, P.C.
Tel. No. 503-266-5590 Fax No. 503-212-6392

## CERTIFICATE OF COMPLIANCE
## WITH WORD COUNT/ PAGE LIMITATION

<u>Brief length</u>

I certify that (1) this brief complies with the word-count limitation in LR 7-2(b), because it contains 38 pages which is less than the 40 pages authorized by this court on January 27, 2015, in total 12,947 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificate of counsel.

Dated: February 2, 2015

Tyler Smith & Associates, P.C.

/s/ Tyler Smith
Tyler Smith (OSB# 075287)
Attorney for Petitioner
181 N Grant St STE 212
Canby, OR 97013
(503)266-5590

1    **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 2 day of February, 2015, I caused a true copy of

**PLAINTIFFS RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY**

**JUDGMENT** to be served upon the following named parties or their attorney by CM/ECF:

MARC ABRAMS #890149
TRACY J. WHITE #904127
Senior Assistant Attorneys General
Trial Attorneys
Tel (971) 673-1880
Fax (971) 673-5000
Marc.Abrams@doj.state.or.us
Tracy.J.White@doj.state.or.us
Of Attorneys for Defendants


DATED this 2 day of February, 2015.

Tyler Smith & Associates, P.C.

/s/ Tyler Smith
Tyler Smith (OSB# 075287)
Attorney for Petitioner
181 N Grant St STE 212
Canby, OR 97013
(503)266-5590

2  **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY
   JUDGMENT**